**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

DAVID M. RODRIGUEZ; JUDY
GONZALES POGGI; JOSE MENDOZA;
FRANK RIVERA; MARIO QUEZADA;
ESTHER ANAYA-GARCIA, on behalf
of themselves and all others
similarly situated,
        *Plaintiffs-Appellees,*

        v.

MARICOPA COUNTY COMMUNITY
COLLEGE DISTRICT; THE GOVERNING
BOARD OF THE MARICOPA COUNTY
COMMUNITY COLLEGE DISTRICT,
        *Defendants,*

        and

RUFUS GLASPER; PHILLIP RANDOLPH,
in their official and individual
capacities,
        *Defendants-Appellants.*

No. 08-16073

D.C. No.
2:04-cv-02510-EHC

OPINION

Appeal from the United States District Court
for the District of Arizona
Earl H. Carroll, District Judge, Presiding

Argued and Submitted
October 19, 2009—Tempe, Arizona

Filed May 20, 2010

7255

Before: Sandra Day O'Connor, Associate Justice,*
Alex Kozinski, Chief Judge, and Sandra S. Ikuta,
Circuit Judge.

Opinion by Chief Judge Kozinski

---

*The Honorable Sandra Day O'Connor, Associate Justice of the United States Supreme Court (Ret.), sitting by designation pursuant to 28 U.S.C. § 294(a).

**COUNSEL**

Richard S. Cohen, Troy P. Foster and Justin S. Pierce, Ford & Harrison LLP, Phoenix, Arizona, for the defendants-appellants.

David G. Hinojosa, Nina Perales and Diego Bernal, Mexican American Legal Defense and Educational Fund (MALDEF), San Antonio, Texas; and David G. Gomez and Michael J. Petitti, Gomez & Petitti, Phoenix, Arizona, for the plaintiffs-appellees.

**OPINION**

KOZINSKI, Chief Judge:

We consider the interplay between the First Amendment and the right to be free of workplace harassment on the basis of protected status.

### Facts

Professor Walter Kehowski sent three racially-charged emails over a distribution list maintained by the Maricopa County Community College District, where he teaches math. Every district employee with an email address received a copy. Plaintiffs, a certified class of the district's Hispanic employees, sued the district, its governing board and two district administrators (the chancellor and the president) claiming that their failure to properly respond to Kehowski's emails created a hostile work environment in violation of Title VII and the Equal Protection Clause.

Kehowski's first email had "Dia de la raza" as its subject line and asked, "Why is the district endorsing an explicitly racist event?" (Citations and emphasis omitted.) Día de la Raza translates as "Day of the Race" and is celebrated by some Hispanics instead of Columbus Day.[1]

Kehowski's next email, sent almost a week later, began, "YES! Today's Columbus Day! It's time to acknowledge and celebrate the superiority of Western Civilization." Kehowski then offered excerpts from a variety of articles. One article quoted Arthur Schlesinger, Jr. as saying that "democracy, human rights and cultural freedom" are "European ideas." Another promoted a theory that "Native Americans actually committed genocide against the original white-skinned inhabitants of North America." (Emphasis omitted.) Yet another argued that "America did not become the mightiest nation on earth without distinct values and discrimination" and asserted that "[o]ur survival depends on discrimination."

Two days later, Kehowski sent a third email that began, "Ad hominem attacks are the easiest to launch and the most difficult to defend against." Kehowski quoted an email calling

---

[1]*See* Wikipedia, Columbus Day, at http://en.wikipedia.org/Columbus_Day (last visited March 19, 2010).

his messages "racist" and said: "Boogie-boogie-boo to you too! Racist? Hardly. Realistic is more like it." He quoted an email claiming that "[m]ost thinking people believe that the European, Christian victory over the Moorish, Islamic (and African) culture in Spain is an example of a victory of a 'backward' culture over one that was more civilized." He responded: "[H]istory has answered quite convincingly which cultures were backward." And he warned: "[I]f we don't pull ourselves out of the multicultural stupor, another culture with some pretty unsavory characteristics (*here*, *here*, and *here*) will dominate (*here*, *here*, and *here*) [and not without a little help from the treasonous scum *Bill Clinton*]." (Bracketed words in original.)

This third email linked to a website maintained by Kehowski on the district's web server. The school's technology policy encouraged faculty to develop district-hosted websites for use "as a learning tool," although faculty also maintained sites of a personal nature. Kehowski's site declared that "[t]he only immigration reform imperative is preservation of White majority" and urged visitors to "[r]eport illegal aliens to the INS." (Emphasis omitted.) Like his emails, Kehowski's website quoted and linked to articles. One critiqued a "shallow and self-contradictory" ideology in which "[r]ace must be held meaningless only by whites." Another expressed concern that "[t]he persistent inflow of Hispanic immigrants threatens to divide the United States into two peoples."

Prominent figures in the community condemned Kehowski's ideas. The president of the college circulated an email:

> [T]he openness of our [email] system . . . allows individuals to express opinions on almost any subject. . . . However, when an e-mail hurts people, hurts the college, and is counter to our beliefs about inclusiveness and respect, I cannot be silent. In that

context, I want everyone in the [college] community to know that personally and administratively, I support the District's values and philosophy about diversity.

The chancellor of the district issued a press release stating that Kehowski's "message is not aligned with the vision of our district" but explaining that disciplinary action against Kehowski "could seriously undermine our ability to promote true academic freedom." Although Kehowski's emails were not sent to any students, many obviously found out about them, and the student body president circulated an email to the faculty declaring that Kehowski "did not do anything illegal, but none of us believe [his] actions were ethical or in good taste." Contemporary press accounts describe vocal student protests against Kehowski.

A number of district employees also complained to the administration that Kehowski's statements had created a hostile work environment. No disciplinary action was taken against Kehowski, and no steps were taken to enforce the district's existing anti-harassment policy.

Plaintiffs now seek damages and other relief on the ground that defendants "failed to take immediate or appropriate steps to prevent Mr. Kehowski from sending Plaintiffs harassing emails" and from disseminating harassing speech via his district-hosted website. Complaint at 4. The district court granted summary judgment to the president and chancellor on plaintiffs' Title VII claim on the ground that Title VII liability does not extend to agents of the employer. But it denied summary judgment to the president and chancellor on plaintiffs' constitutional claim, including on the issue of qualified immunity, and to the remaining defendants on both the constitutional and Title VII claims. The president and chancellor brought this interlocutory appeal, challenging the district court's ruling that they are not entitled to qualified immunity as to the alleged Equal Protection violation.

### Jurisdiction

On an interlocutory appeal from a denial of qualified immunity, jurisdiction is limited to the purely legal question of immunity. *See Cunningham* v. *Gates*, 229 F.3d 1271, 1286 (9th Cir. 2000). "[W]here the district court denies immunity on the basis that material facts are in dispute, we generally lack jurisdiction." *Id.*

The district court characterized the central question of our qualified immunity analysis—whether defendants violated a clearly established right of which a reasonable person would have known—as a factual inquiry, and denied immunity on the grounds that "[a] genuine issue of material fact exists as to whether the acts or omissions of Defendants . . . were objectively reasonable." Plaintiffs claim that we lack jurisdiction to review this determination, and that the question of qualified immunity must therefore go to a jury. But the contours of the right at issue, and the reasonableness of defendants' actions, is not a question of fact—it's a question of law. *See, e.g.*, *Knox* v. *Southwest Airlines*, 124 F.3d 1103, 1107 (9th Cir. 1997). In answering that question, we may not disregard material factual disputes identified by the district court. *Gates*, 229 F.3d at 1286. But we undoubtedly have jurisdiction to determine whether, taking the facts in the light most favorable to plaintiffs, defendants would have violated a constitutional right of which a reasonable government official would have been aware.

### Qualified Immunity

[1] It's clearly established in our circuit that public employees are entitled under the Equal Protection Clause to be free of purposeful workplace harassment on the basis of protected status. *See Alaska* v. *EEOC*, 564 F.3d 1062, 1069 (9th Cir. 2009) (en banc); *Bator* v. *Hawaii*, 39 F.3d 1021, 1029 (9th Cir. 1994). Defendants therefore do not dispute that employers who become aware of workplace harassment are

required to take reasonable steps to make it stop. But they claim they are entitled to summary judgment based on qualified immunity because they were required to do no more than they did in the circumstances presented here, and if they were required to do more, such a duty was not clearly established. *See Pearson* v. *Callahan*, 129 S. Ct. 808, 815-16 (2009). We begin by addressing the precise scope of the district's constitutional obligation.

Plaintiffs may wish that the district had disciplined or dismissed Kehowski, but the district wasn't required to do so. When an employer is made aware of unlawful harassment, employees are entitled to have the employer take reasonable and appropriate steps to investigate and make it stop. *Andrews* v. *City of Philadelphia*, 895 F.2d 1469, 1479-80 (3d Cir. 1990). A warning or other discipline, even dismissal, may be the appropriate action in some circumstances, but the proper object of an employer's response is to deter and stop further harassment, not to punish the harasser. *See, e.g.*, *Bator*, 39 F.3d at 1029.

[2] Plaintiffs suggest the district should have applied its existing anti-harassment policy to silence Kehowski as soon as the nature of his speech became apparent, either by revoking his access to the district's technology resources or by warning him that further speech would lead to discipline. It's true that a public employer's refusal to enforce existing policies to stop unlawful harassment may violate the Equal Protection Clause. *See, e.g.*, *Flores* v. *Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1135 (9th Cir. 2003). But Kehowski's speech was not unlawful harassment.

[3] Plaintiffs no doubt feel demeaned by Kehowski's speech, as his very thesis can be understood to be that they are less than equal. But that highlights the problem with plaintiffs' suit. Their objection to Kehowski's speech is based entirely on his point of view, and it is axiomatic that the government may not silence speech because the ideas it promotes

are thought to be offensive. *See Brandenburg* v. *Ohio*, 395 U.S. 444, 448-49 (1969); *Saxe* v. *State Coll. Area Sch. Dist.*, 240 F.3d 200, 204 (3d Cir. 2001); *DeAngelis* v. *El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 596-97 (5th Cir. 1995). "There is no categorical 'harassment exception' to the First Amendment's free speech clause." *Saxe*, 240 F.3d at 204; *see also United States* v. *Stevens*, No. 08-769, slip op. at 7 (U.S. April 20, 2010) ("The First Amendment's guarantee of free speech does not extend only to categories of speech that survive an ad hoc balancing of relative social costs and benefits.").

**[4]** Indeed, precisely because Kehowski's ideas fall outside the mainstream, his words sparked intense debate: Colleagues emailed responses, and Kehowski replied; some voiced opinions in the editorial pages of the local paper; the administration issued a press release; and, in the best tradition of higher learning, students protested. The Constitution embraces such a heated exchange of views, even (perhaps especially) when they concern sensitive topics like race, where the risk of conflict and insult is high. *See R.A.V.* v. *City of St. Paul*, 505 U.S. 377, 391 (1992). Without the right to stand against society's most strongly-held convictions, the marketplace of ideas would decline into a boutique of the banal, as the urge to censor is greatest where debate is most disquieting and orthodoxy most entrenched. *See, e.g.*, *Gitlow* v. *New York*, 268 U.S. 652, 667 (1925); *id.* at 673 (Holmes, J., dissenting). The right to provoke, offend and shock lies at the core of the First Amendment.

**[5]** This is particularly so on college campuses. Intellectual advancement has traditionally progressed through discord and dissent, as a diversity of views ensures that ideas survive because they are correct, not because they are popular. Colleges and universities—sheltered from the currents of popular opinion by tradition, geography, tenure and monetary endowments—have historically fostered that exchange. But that role in our society will not survive if certain points of

view may be declared beyond the pale. "Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Keyishian* v. *Bd. of Regents of the Univ. of the State of N.Y.*, 385 U.S. 589, 603 (1967) (quoting *Sweezy* v. *New Hampshire*, 354 U.S. 234, 250 (1957)). We have therefore said that "[t]he desire to maintain a sedate academic environment . . . [does not] justify limitations on a teacher's freedom to express himself on political issues in vigorous, argumentative, unmeasured, and even distinctly unpleasant terms." *Adamian* v. *Jacobsen*, 523 F.2d 929, 934 (9th Cir. 1975).

**[6]** The First Amendment also demands substantial deference to the college's decision not to take action against Kehowski. The academy's freedom to make such decisions without excessive judicial oversight is an "essential" part of academic liberty and a "special concern of the First Amendment." *Regents of the Univ. of Cal.* v. *Bakke*, 438 U.S. 265, 312 (1978) (citation omitted) (internal quotation marks omitted); *see also Brown* v. *Li*, 308 F.3d 939, 952 (9th Cir. 2002); *Edwards* v. *Cal. Univ. of Penn.*, 156 F.3d 488, 492 (3d Cir. 1998) (Alito, J.). If colleges are forced to act as the hall monitors of academia, subject to constant threats of litigation both from professors who wish to speak and listeners who wish to have them silenced, "[m]any school districts would undoubtedly prefer to 'steer far' from any controversial [professor] and instead substitute 'safe' ones in order to reduce the possibility of civil liability and the expensive and time-consuming burdens of a lawsuit." *Monteiro* v. *Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1030 (9th Cir. 1998). To afford academic speech the breathing room that it requires, courts must defer to colleges' decisions to err on the side of academic freedom. Otherwise, schools will inevitably reassess whether hiring a lightning rod like Kehowski—or, for that matter, Larry Summers or Cornel West—is worth the trouble.

These First Amendment principles must guide our interpretation of the right to be free of purposeful workplace harass-

ment under the Equal Protection Clause. When Congress enacted the Fourteenth Amendment, it enshrined a concept of liberty that has been understood to include the "general principle of free speech." *Gitlow*, 268 U.S. at 672 (Holmes, J., dissenting); *see also Meyer* v. *Nebraska*, 262 U.S. 390, 400 (1923). And, in *Meyer*, the Supreme Court relied on the fact that the "American people have always regarded education and acquisition of knowledge as matters of supreme importance" to find that the Fourteenth Amendment protected a teacher's right "to teach and the right of parents to engage him so to instruct their children." *Id.* Since then, the Fourteenth Amendment has consistently been held to incorporate the First Amendment's protection of free speech and academic freedom against the states. *See, e.g.*, *Sweezy*, 354 U.S. at 255; *Keyishian*, 385 U.S. at 604.

History likewise suggests that the Fourteenth Amendment was intended to extend, and not retract, the freedoms enshrined in the First. In the run up to the Civil War, professors and colleges played a key role in the spread of abolitionist ideas. *See* Robert Bruce Slater, *The American Colleges That Led the Abolition Movement*, J. Blacks in Higher Educ., Sept. 1995 at 95-97. The South moved to harshly suppress abolitionism as dangerous and incendiary, and Republicans responded by making "demands for free speech a centerpiece of their political program." Michael Kent Curtis, *The 1859 Crisis Over Hinton Helper's Book,* The Impending Crisis*: Free Speech, Slavery, and Some Light on the Meaning of the First Section of the Fourteenth Amendment*, 68 Chi.-Kent L. Rev. 1113, 1151 (1993); *see also id.* at 1131, 1134-38. It can hardly be surprising, then, that the Reconstruction Congress sought to protect freedom of speech along with other fundamental liberties when it enacted the Fourteenth Amendment. *See, e.g.*, *id.* at 1172-74. Free speech has been a powerful force for the spread of equality under the law; we must not squelch that freedom because it may also be harnessed by those who promote retrograde or unattractive ways of thought.

RODRIGUEZ v. MARICOPA CO. COMM. COLLEGE        7267

**[7]** We therefore doubt that a college professor's expression on a matter of public concern, directed to the college community, could ever constitute unlawful harassment and justify the judicial intervention that plaintiffs seek. *See* Eugene Volokh, Comment, *Freedom of Speech and Workplace Harassment*, 39 UCLA L. Rev. 1791, 1849-55 (1992). Harassment law generally targets conduct, and it sweeps in speech as harassment only when consistent with the First Amendment. *See R.A.V.*, 505 U.S. at 389-90. For instance, racial insults or sexual advances directed at particular individuals in the workplace may be prohibited on the basis of their non-expressive qualities, *Saxe*, 240 F.3d at 208, as they do not "seek to disseminate a message to the general public, but to intrude upon the targeted [listener], and to do so in an especially offensive way," *Frisby* v. *Schultz*, 487 U.S. 474, 486 (1988). *See, e.g.*, *Flores*, 324 F.3d at 1133, 1135; *Meritor Sav. Bank, FSB* v. *Vinson*, 477 U.S. 57, 60, 73 (1986). But Kehowski's website and emails were pure speech; they were the effective equivalent of standing on a soap box in a campus quadrangle and speaking to all within earshot. Their offensive quality was based entirely on their meaning, and not on any conduct or implicit threat of conduct that they contained.

**[8]** In the context of a supervisory relationship, advocacy of discriminatory ideas can connote an implicit threat of discriminatory treatment and *could* therefore amount to intentional discrimination.[2] But plaintiffs have not alleged that Kehowski's speech was made in such a context, or that he has any control over their employment. Nor did the administration

---

[2]Because this is not such a case, we cannot hold what standard should be applied to determine whether advocacy of discriminatory ideas by a supervisor contains an implicit threat and constitutes harassment. Suffice to say that supervisors retain First Amendment rights and their speech is entitled to significant breathing space before it will be deemed harassment. *Cf. Lovell* v. *Poway Unified Sch. Dist.*, 90 F.3d 367, 372 (9th Cir. 1996) (speech can only be prohibited as a threat if a reasonable person would foresee that it would be interpreted as a serious expression of intent to act in the threatened manner).

in any way endorse Kehowski's views or adopt them as the district's official position: Although Kehowski disseminated his views using the district's web servers and email list, providing such resources on a content-neutral basis to facilitate campus discussion does not suggest official endorsement of the resulting speech. *See Rosenberger* v. *Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 841 (1995).

[9] Plaintiffs assert that the district could have applied its harassment policy to suppress Kehowski's speech because he spoke in a limited or nonpublic forum. For the purpose of this appeal, we assume plaintiffs are correct that the email list and servers were limited or nonpublic forums. *See Perry Educ. Ass'n* v. *Perry Local Educators' Ass'n*, 460 U.S. 37, 49 (1983). But even in a nonpublic forum, state actors may not suppress speech because of its point of view, *id.* at 46, and that is exactly what application of the harassment policy to Kehowski's emails and website would have done. Others could speak about race and culture without violating the policy; Kehowski's speech would be singled out for suppression because of his disfavored opinions on those issues.

Nor are we impressed by plaintiffs' suggestion that the district could have suppressed Kehowski's speech by limiting discussion on its mailing list and web servers to official school business. We assume the First Amendment would not prevent the district from restricting use in that manner. *See id.* at 49; *Desyllas* v. *Bernstine*, 351 F.3d 934, 943-44 (9th Cir. 2003). We also assume plaintiffs are correct that the district already had such a written policy, although it was not enforced. Plaintiffs don't allege that defendants selectively applied this policy in favor of Kehowski's speech; their claim is that once Kehowski began to speak, defendants were obliged to apply the policy to silence Kehowski, even if that meant they had to also silence everybody else.

The power to limit or close a forum does not entail any such obligation. If speech is harassment, the proper response

is to silence the harasser, not shut down the forum. And if speech is not harassment, listeners who are offended by the ideas being discussed certainly are not entitled to shut down an entire forum simply because they object to what some people are saying. Such a rule would contravene the First Amendment's hostility towards laws that "confer broad powers of censorship, in the form of a 'heckler's veto,' upon any opponent of" certain points of view. *Reno* v. *ACLU*, 521 U.S. 844, 880 (1997). Because some people take umbrage at a great many ideas, very soon no one would be able to say much of anything at all.

**[10]** We therefore conclude that defendants did not violate plaintiffs' right to be free of workplace harassment. *See Pearson*, 129 S. Ct. at 818. The district court's finding that defendants' failure to respond to the emails created a jury question as to discriminatory purpose does not bar a grant of immunity, as defendants may not be liable unless plaintiffs show both conduct constituting harassment and a discriminatory purpose behind the employer's failure to respond. *See Bator*, 39 F.3d at 1029. Because we find as a matter of law that plaintiffs have not met the first of those requirements, and therefore cannot show a constitutional violation, we reverse the district court's denial of qualified immunity and do not reach plaintiffs' additional argument that the scope of the right was not clearly established. On remand, the district court shall reconsider its rulings on the remaining defendants' summary judgment motions to ensure that they are consistent with our ruling today.

\* \* \*

It's easy enough to assert that Kehowski's ideas contribute nothing to academic debate, and that the expression of his point of view does more harm than good. But the First Amendment doesn't allow us to weigh the pros and cons of certain types of speech. Those offended by Kehowski's ideas should engage him in debate or hit the "delete" button when

7270     Rodriguez v. Maricopa Co. Comm. College

they receive his emails. They may not invoke the power of the government to shut him up.

**REVERSED.**